John R. Parker, Jr., California Bar No. 257761
**ALMEIDA LAW GROUP LLC**
3550 Watt Avenue, Suite 140
Sacramento, California 95821
jrparker@almeidalawgroup.com

David S. Almeida (*pro hac vice forthcoming*)
Britany Kabakov (*pro hac vice forthcoming*)
Matthew J. Langley, California Bar No. 342846
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 312-576-3024
david@almeidalawgroup.com
matt@almeidalawgroup.com
britany@almeidalawgroup.com

*Attorneys for Plaintiffs & the Proposed Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.S. and C.M., *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>vs.<br><br>COTTAGE HEALTH,<br><br>Defendant. | Case No.:   2:23-cv-9528<br><br>**CLASS ACTION COMPLAINT**<br><br>1. VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIV. CODE SECTION 56, *et seq.*<br><br>2. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE SECTION 630, *et seq.*<br><br>3. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE SECTION 17200, *et seq.*<br><br>4. INVASION OF PRIVACY - INTRUSION UPON SECLUSION |

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5.  BREACH OF IMPLIED
   CONTRACT

6.  VIOLATION OF CALIFORNIA
   CONSUMERS LEGAL
   REMEDIES ACT, CAL. CIV.
   CODE SECTION 1750, *et seq.*

7.  NEGLIGENCE

8.  BREACH OF CONFIDENCE

9.  BREACH OF FIDUCIARY DUTY

10. UNJUST ENRICHMENT

11. VIOLATION OF ELECTRONIC
   COMMUNICATIONS PRIVACY
   ACT, 18 U.S.C. SECTION
   2511(1), *et seq.*

**DEMAND FOR JURY TRIAL**

CLASS ACTION COMPLAINT

Plaintiffs K.S. and C.M. ("**Plaintiffs**"), individually and on behalf of all others similarly situated, bring this action against Defendant Cottage Health ("**Cottage Health**" and/or "**Defendant**"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and good faith belief as to all other matters based on the investigation conducted by Plaintiffs' attorneys.

## **INTRODUCTION**

1.     This case concerns a very serious breach of Defendant's data privacy and security obligations as it installed certain tracking technologies on its digital properties to collect and disclose to unauthorized third parties Plaintiffs' and Class Members' personally identifiable information ("**PII**") and protected health information ("**PHI**") (collectively referred to as "**PII/PHI**" or "**Private Information**") for its own pecuniary gain.

2.     Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of such information can have serious consequences including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[1]

3.     Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment, which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and

---

[1] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022), *available at* https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited Oct. 25, 2023) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized.").

CLASS ACTION COMPLAINT

not disclosed to unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

4.    Reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("**FTC**") recently published a bulletin entitled *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* **make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.**"[2]

5.    The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> ***Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.***
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to***

[2] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023) (emphasis added), *available at* https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases (last visited Oct. 25, 2023).

CLASS ACTION COMPLAINT

***marketing firms via tracking pixels on websites or software development kits on apps, watch out.***

[Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that ***may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information****.*[3]

6.   Likewise, in July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about the use of online tracking technologies that could result in unauthorized disclosures of Sensitive Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[4]

7.   Despite these warnings from federal regulators, Defendant deployed tracking technologies that allowed third-party companies, such as Facebook, to intercept visitors to and users of its websites ("**Users**" or "**Class Members**") data to sell targeted advertising and/or otherwise monetize the data in the ever-growing marketplace for PII and PHI.

---

[3] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization.

[4] *See* https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf.

3

8.      Defendant Cottage Health is a not-for-profit healthcare system that includes Santa Barbara Cottage Hospital and its affiliated Cottage Children's Medical Center and Cottage Rehabilitation Hospital, Goleta Valley Cottage Hospital and Santa Ynez Valley Cottage Hospital.

9.      Defendant has disregarded the privacy rights of Users by intentionally, willfully, recklessly and/or negligently failing to implement adequate and reasonable measures to ensure that the Users' Private Information was safeguarded. Instead, Defendant made the conscious decision to use certain tracking technologies, which allowed unauthorized third parties, including Meta Platforms, Inc. d/b/a Meta ("**Facebook**"), to intercept Users' clicks, communications on, and visits to Defendant's websites, including www.cottagehealth.org/ (the "**Website**") and www.cottagehealth.org/mychart (the "**Portal**") (collectively with the Website, the "**Web Properties**").

10.     Unbeknownst to Users and without their authorization or informed consent, Defendant installed Facebook's tracking tool, the Meta Pixel ("**Meta Pixel**" or "**Pixel**") and other third-party tracking technologies, on its Web Properties in order to intercept and send Private Information to third parties such as Facebook and/or Google LLC.

11.     Defendant encouraged Plaintiffs and Class Members to access and use various digital tools via its Web Properties to, among other things, receive healthcare services, in order to gain additional insights into its Users, improve its return on marketing dollars and, ultimately, increase its revenue.

12.     Cottage Health's "Disclosure of Health Information" proclaims that it will guarantee "[c]onfidential treatment of all communications and records pertaining to your care."[5] No mention of Facebook, Pixels or the use of tracking technologies to collect and to disclose Private Information is made in Cottage

---

[5] *Id.*

CLASS ACTION COMPLAINT

Health's Privacy Policy or Website, and there is no indication that Cottage Health is in the business of transmitting its Users' PHI to third parties via its Website.[6]

13.　Pixels are snippets of code that track Users as they navigate through a website—logging which pages they visit, each button they click and what information they provide in online forms. These Pixels collect Users' confidential and Private Information—including details about their medical conditions, treatments, providers sought and appointments—and send it to Facebook without prior, informed consent.

14.　More specifically, the Meta Pixel sends information to Facebook via scripts running in a person's internet browser, so each data packet comes labeled with a specific internet protocol ("**IP**") address that can be used in combination with other data to identify an individual or household. Additionally, if the person has an active Facebook account, the IP address is paired with their personal unique Facebook ID ("**FID**"), which Facebook uses to identify that individual.[7]

15.　In addition to the Facebook Pixel, Defendant, upon information and good faith belief, also installed and implemented Facebook's Conversions Application Programming Interface ("**CAPI**") on its Web Properties servers.[8]

_____

[6] Cottage Health Notice of Privacy Practices, https://www.cottagehealth.org/app/files/public/d5012f60-1d97-4c41-b129-be99a9a9b78a/Privacy_Practices_062315.pdf (last visited Nov. 8, 2023).

[7] Regardless, Facebook tracks and collects data even on people who don't have a Facebook account or have deactivated their Facebook accounts. They can be in an even worse situation since the data is being collected about them, but because they don't have an account (or an active account), they cannot clear past activity or disconnect the collection of future activity. In the past, these were referenced as "ghost accounts" or "shadow profiles."

[8] CAPI "works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Nov. 8, 2023).

CLASS ACTION COMPLAINT

16.     Unlike the Facebook Pixel, which co-opts a website user's browser and forces it to disclose information to third parties in addition to the website owner, CAPI does not cause the User's browser to transmit information directly to Facebook. Rather, CAPI tracks the User's website interaction, including Private Information, records and stores that information on the website owner's servers and then transmits the data to Facebook from the website owner's servers.[9]

17.     Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[10]

18.     Despite the clear and unequivocal prohibition on the disclosure of PHI without consent, Defendant chose to use the Pixel and CAPI data for marketing purposes in an effort to bolster its profits. That is, despite professing that "[w]e understand that medical information about you and your health is personal, and we are committed to protecting it,"[11] Defendant put its desire for profit over its patients' privacy rights.

19.     The Private Information illegally sent to Facebook (and other third parties) is, in turn, associated with other information to create very fulsome user profiles that are mined for marketing and other commercial purposes. For example, in the case of information sent by Defendant to Facebook, such information was then linked to Plaintiffs' profiles so that there was no anonymity in that Facebook

---

[9] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels," https://revealbot.com/blog/facebook-conversions-api/ (last visited Nov. 8, 2023).

[10] *See* https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Nov. 8, 2023).

[11] Cottage Health Notice of Privacy Practices, *see supra* note 6.

and/or any third parties who were able to access the information would be able to associate this personal health data with Plaintiffs (and all Class Members).

20.    Plaintiffs and Class Members who visited and used Defendant's Web Properties understandably thought they were communicating with <u>only</u> their trusted healthcare providers, and reasonably believed that their sensitive and private PHI would be guarded, as promised, with the utmost care.

21.    In browsing Defendant's Web Properties—to make an appointment, locate a doctor with a specific specialty, find sensitive information about their diagnosis, or investigate treatment for their diagnosis—Plaintiffs and Class Members did not expect that every search (including exact words and phrases they typed into Defendant's Website search bar), page visits, or even their access/interactions on Defendant's online portals would be intercepted, captured, or otherwise shared with Facebook in order to target Plaintiffs and Class Members, in conscious disregard of their privacy rights.

22.    In exchange for installing the Pixels, Facebook provides Defendant with analytics about the advertisements it has placed as well as tools to target people who have visited its Web Properties.

23.    While the information captured and disclosed without permission may vary depending on the Pixel(s) embedded, these "data packets" can be extensive, transmitting, for example, not just the name of the physician and her field of medicine, but also the first name, last name, email address, phone number, zip code and city of residence entered in the booking form. That data is linked to a specific IP address. The amalgamation of these data points and unique identifying information results in an egregious, unauthorized dissemination of highly sensitive Private Information unique to each individual User.

24.    The Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information they input into a website. In addition, if the person is (or recently has) logged into Facebook when they visit a particular website

when a Meta Pixel is installed, some browsers will attach third-party cookies—another tracking mechanism—that allow Facebook to link Pixel data to specific Facebook accounts.

25.    Alarmingly, the use of Meta Pixels on Defendant's Web Properties tracks extremely sensitive PHI such as health conditions (e.g., diabetes, pregnancy or breast cancer), diagnoses (e.g., COVID-19 or AIDS), procedures, treatment status, the treating physician (including their specialty and location) and PII.

26.    Plaintiffs had their Private Information, including sensitive medical information, harvested by Facebook through the Meta Pixel tracking tool without their consent when they entered their information into Defendant's Web Properties and continued to have their privacy violated when their Private Information was used to turn a profit by way of targeted advertising related to their respective medical conditions and treatments sought.

27.    Defendant knew that by embedding the Meta Pixel—a proprietary tracking and advertising tool developed by Facebook—on its Web Properties, it was permitting Facebook to collect and use Plaintiffs' and Class Members' Private Information, including sensitive medical information.

28.    Defendant (or any third parties) did not obtain Plaintiffs' and Class Members' prior consent before sharing their sensitive, confidential communications and Private Information with third parties such as Facebook, the largest social media company on earth, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue.[12]

29.    Defendant failed to issue a notice that Plaintiffs' and Class Members'

---

[12] This Court will not have to look far to find evidence of Meta's violations of privacy laws. Just in May of this year, the European Union fined Meta "a record-breaking" $1.3 billion for violating EU privacy laws. *See* Hanna Ziady, *Meta slapped with record $1.3 billion EU fine over data privacy*, https://www.cnn.com/2023/05/22/tech/meta-facebook-data-privacy-eu-fine/index.html (last accessed Nov. 8, 2023).

CLASS ACTION COMPLAINT

Private Information had been impermissibly disclosed to an unauthorized third party. In fact, Defendant **never** disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications, data and Private Information with Facebook and other unauthorized third parties.[13]

30.    Defendant's actions constitute an extreme invasion of Plaintiffs' and Class Members' right to privacy and violate federal and state statutory and common law as well as Defendant's statements about Disclosure of Health Information.[14]

31.    As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with doctors online; (iii) emotional distress and heightened concerns related to the release of Private Information to third parties; (iv) loss of the benefit of the bargain; (v) diminution of value of the Private Information; (vi) statutory damages and (vii) continued and ongoing risk to their Private Information. Plaintiffs and Class Members have a substantial risk of future harm, and thus injury in fact, due to the continued and ongoing risk of misuse of their Private Information that Defendant shared with third parties.

_____

[13] In contrast to Defendant, in the last year, several medical providers that installed the Meta Pixel on their Web Properties have provided their patients with notices of data breaches caused by the Pixel transmitting PHI to third parties. *See*, *e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf; Annie Burky, *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies,* FIERCE HEALTHCARE (October 20, 2022), https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3; *Novant Health Notifies Patients of Potential Data Privacy Incident*, PR NEWSWIRE (August 19, 2022), https://www.prnewswire.com/news-releases/novant-health-notifies-patients-of-potential-data-privacy-incident-301609387.html.

[14] Disclosure of Health Information, Cottage Health, https://www.cottagehealth.org/about/privacy-practices-terms- of-use/disclosure-of-health-information/ (last visited October 14, 2023).

CLASS ACTION COMPLAINT

32.     Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and therefore assert the following statutory and common law claims against Defendant: (i) Violation of the California Confidentiality of Medical Information Act ("**CMIA**"), Cal. Civ. Code § 56, *et seq.*; (ii) Violation of the California Invasion of Privacy Act ("**CIPA**"), Cal. Penal Code § 630, *et seq.*; (iii) Violation of California's Unfair Competition Law ("**UCL**"), Cal. Bus. & Prof. Code § 17200, *et seq.* – Unlawful and Unfair Business Practices; (iv) Common Law Invasion of Privacy; (v) Common Law Breach of Implied Contract; (vi) Violation of California Consumers Legal Remedies Act ("**CLRA**"), Cal. Civ. Code § 1750, *et seq.*; (vii) Negligence; (viii) Common Law Breach of Confidence, (ix) Common Law Breach of Fiduciary Duty; (x) Common Law Unjust Enrichment and (xi) violation of the Electronic Communications Privacy Act, 18 U.S.C. §2511(3)(a), *et seq.*.("**ECPA**").

## PARTIES

33.     Plaintiff K.S. is, and at all relevant times was, a California resident, residing in Santa Barbara County, California, where she intends to remain indefinitely.

34.     Plaintiff C.M. is, and at all relevant times was, a California resident, residing in Santa Barbara County, California, where she intends to remain indefinitely.

35.     Defendant Cottage Health is a not-for-profit organization providing healthcare services to patients in Santa Barbara County, California. Defendant Cottage Health is incorporated in California, with its principal place of business located at 400 W. Pueblo Street, Santa Barbara, California 93105.

## JURISDICTION & VENUE

36.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than one hundred

(100) putative class members defined below, and minimal diversity exists because a significant portion of putative class members are citizens of a state different from the citizenship of at least one Defendant.

37.    Pursuant to 28 U.S.C. Section 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Plaintiffs are citizens of California, reside in this District and used Defendant's Web Properties within this District. Moreover, Defendant received substantial compensation from offering healthcare services in this District, and Defendant made numerous misrepresentations which had a substantial effect in this District.

38.    Defendant is subject to personal jurisdiction in California based upon sufficient minimum contacts that exist between Defendant and California. Defendant is incorporated in California, maintains its principal place of business in California, is authorized to conduct and is conducting business in California.

## FACTUAL BACKGROUND

**A.    *Defendant Improperly Disclosed Plaintiffs' & Class Members' Private Information.***

39.    Defendant's hospital system includes Santa Barbara Cottage Hospital, Cottage Children's Medical Center, Cottage Rehabilitation Hospital, Santa Ynez Valley Cottage Hospital and Goleta Valley Cottage Hospital, 47 specialty care clinics and services and Cottage Virtual Care - Virtual Visits.[15]

40.    As the owner and operator of these medical centers and entities, Defendant offers a wide range of services, from primary and urgent care to cancer treatment, concussion and diabetes treatment, psychiatry, stroke care and imaging and radiology.[16]

---

[15] *See* https://www.cottagehealth.org/ (last visited Nov. 8, 2023).

[16] *See* https://www.cottagehealth.org/services/ (last visited Nov. 8, 2023).

41.     Defendant utilized Facebook advertisements and intentionally installed the Pixel and CAPI on its Web Properties.

42.     The Pixel is a piece of code that Defendant commonly used to measure activity and experiences on its Web Properties.

43.     CAPI is another tool that Defendant used to track its users' actions on its Web Properties, including by avoiding ad blockers that can prevent the Pixel from gathering users' data.

44.     Through seeking and using Defendant's services as a medical provider and utilizing the Web Properties services, Plaintiffs' and Class Members' Private Information was intercepted in real-time and then disseminated to Facebook, and potentially to other third parties, via the Pixel that Defendant surreptitiously installed on its Web Properties.

45.     Plaintiffs and Class Members did not intend or had any reason to suspect their Private Information would be shared with Facebook or that Defendant was tracking their every movement and disclosing it to Facebook when they provided highly sensitive information on the Web Properties.

46.     Defendant did not disclose to or warn Plaintiffs or Class Members that Defendant used the Private Information contained in Plaintiffs' and Class Members' Web Properties submissions for marketing purposes.

47.     Plaintiffs and Class Members never consented, agreed, authorized or otherwise permitted Defendant to disclose their Private Information.

48.     Upon information and belief, Defendant intercepted and disclosed the following non-public private information to Facebook:

    a.  Plaintiffs' and Class Members' status as medical patients;
    b.  Plaintiffs' and Class Members' communications with Defendant through its Web Properties, including specific text queries typed into the search bar, medical conditions for which they sought treatments and treatments sought;
    c.  Plaintiffs' and Class Members' searches for appointments,

CLASS ACTION COMPLAINT

appointment details, location of treatments, medical providers and their specialties, medical conditions and treatments;

d.  PII, including but not limited to patients' locations, IP addresses, device identifiers and an individual's unique Facebook ID.

49.    Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (i) implemented technology (*i.e.*, Pixels) that surreptitiously tracked, recorded and disclosed Plaintiffs' and other online patients' confidential communications and Private Information; (ii) disclosed patients' protected information to Facebook—an unauthorized third-party and (iii) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

**B.    Background on Facebook's Platform & Its Business Tools.**

50.    Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021.[17] Roughly 97% of that came from selling advertising space.[18]

51.    As a core part of its business, Facebook maintains profiles on users that include the user's real names, locations, email addresses, friends, likes and communications that Facebook associates with personal identifiers, such as IP addresses.

52.    Facebook also tracks non-Facebook users through its widespread internet marketing products and source code.[19]

---

[17]FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 8, 2023).

[18] *Id.*

[19] Source code may also command a web browser to send data transmissions to third parties via pixels or web bugs, tiny 1x1 invisible GIF files that effectively open a

53.    Facebook encourages and promotes entities and website owners, such as Defendant, to utilize its "Business Tools" to gather, identify, target and market products and services to individuals.

54.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("**URL**") and metadata, or when a user downloads a mobile application or makes a purchase.[20]

55.    Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[21] Advertisers can even create their own tracking parameters by building a "custom event."[22]

---

spying window through which a website funnels data about users and their actions to third parties.

[20]    *See* FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last visited Nov. 7, 2023); APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Nov. 8, 2023).

[21]    SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Nov. 8, 2023).

[22]    ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited Nov. 7, 2023); *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Nov. 8, 2023).

56.     One Business Tool is the Facebook Pixel. Facebook offers this code to advertisers, like Defendant, to integrate into their websites. As the name implies, the Facebook Pixel "tracks the people and type of actions they take."[23]

57.     When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers. This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.

58.     This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Web Properties— Defendant's own code and Facebook's embedded code.

59.     Facebook causes the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's servers alongside additional information that transcribes the communication's content and the individual's identity. Consequently, when Plaintiffs and Class Members visited Defendant's Web Properties and entered sensitive search terms (*e.g.*, Breast or Prostate Cancer, Diabetes Management or AIDS Treatment) on Defendant's Web Properties, their Private Information was transmitted to Facebook, including, but not limited to, physician and appointment selected, treatments and care options and specific button/menu selections.

60.     Plaintiffs' and Class Members' identities could be easily determined based on the FID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

61.     Notably, this transmission ***only*** occurs on webpages that contain the Pixel. Thus, Plaintiffs' and Class Member's Private Information would ***not*** have

---

[23] RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited Nov. 8, 2023).

been disclosed to Facebook via the Pixel but for Defendant's decision to install the Pixel on its Web Properties. Plaintiffs' and Class Member's Private Information would not have been disclosed to Facebook via CAPI but for Defendant's decision to install and use that tool.

62.     Similarly, Plaintiffs' and Class Members' Private Information would not have been disclosed to Facebook via CAPI but for Defendant's decision to install and implement that tool. By installing and implementing both tools, Defendant caused Plaintiffs' and Class Members' communications to be intercepted and transmitted to Facebook via the Pixel, and it caused a second improper disclosure of that information via CAPI.

**C.    *How Defendant Discloses Class Members' Protected Health Information and Assists with Intercepting Communications.***

63.     When patients visit Defendant's Web Properties via an HTTP Request to Cottage Health's server, Defendant's server sends an HTTP Response, including the Markup that displays the Webpage visible to the user and Source Code (with the Pixel).[24]

64.     The patient visiting this web page only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses.

65.     Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) and to send those communications to Facebook, including full string URLs containing terms entered into search fields and fillable forms, button click data and keystrokes.

---

[24] An HTTP request is an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. An HTTP response is an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

CLASS ACTION COMPLAINT

66.    This occurs because the Pixel embedded in Cottage Health's Source Code is programmed to automatically track and transmit Users' communications contemporaneously, invisibly and without patient knowledge.

67.    Thus, without consent, Defendant has effectively used its source code to commandeer patients 'computing devices, thereby re-directing their Private Information to third parties.

68.    Tracking codes embedded on Defendant's Web Properties, including Pixel and CAPI, sent non-public Private Information to Facebook, including but not limited to Plaintiffs' and Class Members': (1) status as medical patients; (2) their medical conditions; (3) the type of medical treatment or provider sought, (4) names of specific providers, (5) the fact that the individual attempted to or did book a medical appointment and (6) phrases and search queries conducted via the general search bar.

69.    Third parties, like Facebook, place third-party cookies in the web browsers of users logged into their platforms. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the patient associated with the Personal Information intercepted.

70.    With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology; that is why third parties bent on gathering Private Information, like Facebook, implement workarounds that savvy users cannot evade.

71.    Facebook's workaround, for example, is called CAPI, which is an effective workaround because it does not intercept data communicated from the user's browser. Instead, CAPI "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]."

72.    Thus, the private communications between Users and Defendant, which are necessary to use its Web Properties, are actually received by Defendant and

stored on its server before CAPI collects and sends the Private Information contained in those communications directly from Defendant to Facebook.

73.     Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

74.     Importantly, the Private Information Defendant's Pixel sent to Facebook was sent alongside the Plaintiffs' and Class Members' Facebook ID (c_user cookie or FID), thereby allowing individual patients 'communications with Defendant and the Private Information contained in those communications to be linked to their unique Facebook accounts.[25]

75.     A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status and other details. Because the user's FID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the FID to quickly and easily locate, access and view the user's corresponding Facebook profile. To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

### D. Defendant's Pixel Disseminates Patient Information via its Web Properties

76.     Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (1) implemented technology (i.e., the Facebook Pixel) that surreptitiously tracked, recorded and disclosed Plaintiffs' and other online patients 'confidential communications and Private Information; (2) disclosed patients 'protected information to Facebook—an unauthorized third party; and (3) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

---

[25] Defendant's Web Properties track and transmit data via first party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

77.    For example, when a patient visits www.cottagehealth.org and enters "cancer care" into the search bar, the patient's browser automatically sends an HTTP request to Cottage Health's web server. Cottage Health's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage as depicted in *Figure 1*.[26]



78.    The patient visiting this particular web page only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses.

79.    In reality, Defendant's Source Code and underlying HTTP Requests and Responses share the patient's personal Private Information with Facebook, including the fact that the patient is looking for treatment for their cancer diagnosis—along with the patient's unique Facebook identifiers.

80.    Similarly, if a User types "prenatal care," "diabetes management" or "concussion treatment" into Defendant's search bar, Defendant shares that information with Facebook, along with the User's personal identifiers.

81.    Further, if the User clicks on one of the provider profiles that come up in search results for a specific condition and/or treatment, that information, including

---

[26] The image depicted in *Figure 1* was taken from
https://www.cottagehealth.org/site-search/?term+cancer+care&idx=2.

CLASS ACTION COMPLAINT

1  the provider's name, location and specialty, is automatically shared with Facebook,

2  along with the User's personal identifiers, as depicted in *Figures 2 and 3* below:





82.     Defendant's web pages for providers allow Users to schedule an appointment with that particular provider by clicking a button with their phone number. When a User does so, this information is also shared with Facebook, including the provider's name, specialty and the phone number the User is attempting to call to schedule an appointment, via an "event" categorized as "HeartClickToCall," as depicted in ***Figure 4***:



83.     In addition to controlling a website's Markup, Source Code executes a host of other instructions and can command a website visitor's browser (without a User's consent) to send data transmissions to third parties via Pixels or web bugs,[27] effectively opening a spying window through which the webpage can funnel the visitor's data, actions and communications to third parties.

84.     Looking at the previous example, Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's

---

[27] These Pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.

CLASS ACTION COMPLAINT

1    communications (HTTP Requests) and sending those communications to Facebook.

2        85.    This occurs because the Pixel embedded in Defendant's Source Code is

3    programmed to automatically track and transmit a patient's communications and

4    happens contemporaneously, invisibly and without the patient's knowledge.

5        86.    Consequently, when Plaintiffs and Class Members visit Defendant's

6    Website and communicate their Private Information, it is transmitted to Facebook,

7    including, but not limited to, patient status, health conditions experienced and

8    treatments sought, physician selected, appointments sought, specific button/menu

9    selections and exact words and phrases typed into the search bar. Upon information

10   and good faith belief, this included instances when patients pay a bill, self-enroll in

11   the patient portal, or access their portal via a designated button (or link) on the

12   Website. Each of these activities involves the transmission of sensitive

13   information—such as payment details, personal identifiers required for portal

14   enrollment and portal usage data—which is inevitably communicated to Facebook.

15       87.    Through the Source Code deployed by Defendant, the cookies that they

16   use to help Facebook identify patients include but are not necessarily limited to

17   cookies named: "c_user," "datr," "fr," and "fbp."[28]

18       88.    The "*c_user*" cookie or FID is a type of third-party cookie assigned to

19   each person who has a Facebook account, and it is composed of a unique and

20   persistent set of numbers.

21       89.    A User's FID is linked to their Facebook profile, which generally

22   contains a wide range of demographics and other information about the User,

23   including pictures, personal interests, work history, relationship status and other

24

25   [28] Defendant's Web Properties track and transmit data via first-party and third-party
     cookies. C_user, datr and fr cookies are third-party cookies. The fbp cookie is a
26   Facebook identifier that is set by Facebook source code and associated with
     Defendant's use of the Facebook Pixel. The fbp cookie emanates from Defendant's
27   Website as a putative first-party cookie, but is transmitted to Facebook through
     cookie syncing technology that hacks around the same-origin policy.
28

details. Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access and view the User's corresponding Facebook profile.

90.     The "*datr*" cookie identifies the patient's specific web browser from which the patient is sending the communication. It is an identifier that is unique to the patient's specific web browser and is, therefore, a means of identification for Facebook users. Facebook keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Facebook.

91.     The "*fr*" cookie is a Facebook identifier that is an encrypted combination of the c_user and datr cookies.[29]

92.     A User who accesses Defendant's Website while logged into Facebook will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID, and other personal cookie values, including the datr and fr cookies.

93.     When accessing www.cottagehealth.org, for example, Facebook receives as many as nine (9) cookies, as depicted in **Figure 5** below:

| Name | Value | Domain | P... | Expires / M... | S... |
|---|---|---|---|---|---|
| presence | C%7B%22t3%22%3A%5B%5... | .facebook.com | / | Session | 7... |
| wd | 1664x942 | .facebook.com | / | 2023-02-2... | 1... |
| usida | eyJ2ZXIiOjEsImlkIjoiQXJxNTh... | .facebook.com | / | Session | 6... |
| dpr | 1.5 | .facebook.com | / | 2023-02-2... | 6 |
| sb | GrxtY1jj9IKWnpCg7UAhiJMv | .facebook.com | / | 2023-12-1... | 2... |
| c_user | 540 | .facebook.com | / | 2024-02-1... | 1... |
| datr | Qtl1Y1lVd2UWOuuBmn2Mb... | .facebook.com | / | 2023-11-0... | 2... |
| fr | 09xocanw5tE9ZU6hi.AWXlYZ... | .facebook.com | / | 2023-05-1... | 8... |
| xs | 188%3AWgt7jCKaF4RNPg%3... | .facebook.com | / | 2024-02-1... | 1... |

94.     The fr cookie contains, at least, an encrypted Facebook ID and browser

---

[29] *See* Gunes Acar, *et al.*, *Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission* 16 (March 27, 2015), https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

CLASS ACTION COMPLAINT

identifier.[30] Facebook, at a minimum, uses the fr cookie to identify Users.[31]

95.    At each stage, Defendant Cottage Health also utilized the _fbp cookie, which attaches to a browser as a first-party cookie and which Facebook uses to identify a browser and a User, as depicted in *Figure 6* below:[32]

| Name | Value | Domain | P.. | Expires / M |
|------|-------|--------|-----|-------------|
| _fbp | fb.1.1675971146819.1767747... | .cottagehealth.org | / | 2023-05-1 |

96.    The fr and _fbp cookies expire after ninety days unless the User's browser logs back into Facebook.[33] If that happens, the time resets and another ninety days begins to accrue.

97.    The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

98.    Facebook, at a minimum, uses the fr, _fbp and c_user cookies to link to FIDs and corresponding Facebook profiles.

99.    As shown in *Figures 5 & 6*, Defendant sent these identifiers with the event data.

100.    Plaintiffs never consented, agreed, authorized or otherwise permitted Defendant to disclose their Private Information, nor did they authorize any assistance with intercepting their communications.

101.    Plaintiffs were never provided with any written notice that Defendant

---

[30] Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit* 33 (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[31] *Cookies Policy*, META, https://www.facebook.com/policy/cookies/ (last visited Nov. 8, 2023).

[32] *Id*.

[33] *Id*.

CLASS ACTION COMPLAINT

disclosed its Website users' Private Information, nor were they provided any means of opting out of such disclosures.

102.   By law, Plaintiffs are entitled to privacy in their PHI and confidential communications. Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (i) implemented a system that surreptitiously tracked, recorded and disclosed Plaintiffs' and Class Members' confidential communications, PII and PHI to a third party; (ii) disclosed patients' protected information to Facebook—an unauthorized third-party eavesdropper; and (iii) undertook this pattern of conduct without notifying Plaintiffs and Class Members and without obtaining their express written consent.

## E.   Defendant Violates Its Promises to Users and Patients to Protect Their Confidentiality.

103.   Defendant does not have the legal right to use or share Plaintiffs' and Class Members' data because this information is protected by the HIPAA Privacy Rule. The Privacy Rule does not permit the use and disclosure of Private Information to Facebook for use in targeted advertising.[34]

104.   Beyond Defendant's legal obligations to protect the confidentiality of individuals' Private Information, Defendant's privacy policies and online representations affirmatively and unequivocally state that any personal information provided to Defendant will remain secure and protected.

105.   Cottage Health's "Disclosure of Health Information" informs Users that Cottage Health will guarantee "[c]onfidential treatment of all communications and records pertaining to your care."[35] No mention of Facebook or its Pixel is made in Cottage Health's Privacy Policy or Website, and there is no indication that Cottage

---

[34] *See* 45 C.F.R. § 164.502.

[35] Cottage Health Notice of Privacy Practices, *see supra* note 6.

Health will be in the business of transmitting its Users PHI to third parties via its
Website.[36]

106.   Defendant did not issue a notice that Plaintiffs' and Class Members'
Private Information had been impermissibly disclosed to an unauthorized third
party. In fact, Defendant failed to adhere to a single promise vis-à-vis its duty to
safeguard its Users' Private Information.

107.   Defendant includes its privacy policies and commitments to maintain
the confidentiality of its Users' sensitive information as terms of its contracts with
those Users, including contracts entered with Plaintiffs and the Class Members. In
these contract terms and other representations to Plaintiffs, Class Members and the
public, Defendant promised to take specific measures to protect Plaintiffs' and Class
Members' Private Information, consistent with industry standards and federal and
state law. However, it failed to do so.

108.   Even non-Facebook users can be individually identified via the
information gathered on the Digital Platforms, like an IP address or personal device
identifying information. This is precisely the type of information for which HIPAA
requires the use of de-identification techniques to protect patient privacy.[37]

109.   In fact, in an action currently pending against Facebook related to the
use of their Pixel on healthcare provider web properties, Facebook explicitly stated
it requires Pixel users to "post a prominent notice on every page where the Pixel is
embedded and to link from that notice to information about exactly how the Pixel

---

[36] Cottage Health Notice of Privacy Practices, *see supra* note 6.

[37] *Guidance Regarding Methods for De-identification of Protected Health Information
in Accordance with the Health Insurance Portability and Accountability Act (HIPAA)
Privacy Rule*, U.S. DEP'T OF HEALTH AND HUM. SERVICES,
https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-
identification/index.html (last visited Nov. 8, 2023).

works and what is being collected through it, so it is not invisible."[38] Defendant did not post such a notice.

110.   Facebook further stated that "most providers [...] will not be sending [patient information] to Meta because it violates Meta's contracts for them to be doing that."[39]

111.   Despite a lack of disclosure, Defendant allowed third parties to "listen in" on patients' confidential communications and to intercept and use them for advertising purposes, the very information they promised to keep private, in order to bolster their profits.

## F. Defendant Violated HIPAA.

112.   Defendant's disclosure of Plaintiffs' and Class Members' Private Information to entities like Facebook also violated HIPAA.

113.   Under federal law, a healthcare provider may not disclose PII, non-public medical information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[40]

114.   Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

115.   In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

_____

[38] *See* Transcript of the argument on Plaintiff's Motion for Preliminary Injunction in *In re Meta Pixel Healthcare Litig.*, Case No. CV-22-03580-WHO (N.D. Cal. Nov. 9, 2022) (Hon. J. Orrick), at 19:12-18; *see also In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218 (N.D. Cal. Dec 22, 2022).

[39] *Id.* at 7:20-8:11.

[40] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

27

Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[41]

116.   In its guidance for Marketing, the Department further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third* parties without obtaining authorization from each person on the list. (Emphasis added).[42]

117.   Under HIPAA, an IP address is considered PII: HIPAA defines PII to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

118.   HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See* also, 45 C.F.R. § 164.514(b)(2)(i)(O).

---

[41]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Nov. 7, 2023).

[42]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Nov. 7, 2023).

CLASS ACTION COMPLAINT

119. Facebook, Google and other third-party marketing companies track IP addresses to track and target individual homes and their occupants with advertising.

120. Consequently, Defendant's disclosure of patients' IP addresses violated HIPAA and industry privacy standards.

121. Defendant's placing of third-party tracking code on its Web Properties is a violation of Plaintiffs' Class Members' privacy rights under federal law.[43]

### G. *Defendant Violated Industry Standards.*

122. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship—it is a cardinal rule.

123. The American Medical Association's ("**AMA**") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

124. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.][44]

125. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-

---

[43] While Plaintiffs do not bring a claim under HIPAA itself, this violation evidences Defendant's wrongdoing as relevant to other claims.

[44] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (last visited Nov. 8, 2023).

CLASS ACTION COMPLAINT

identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.[45]

126. AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping with ethics guidelines for confidentiality.[46]

## H. *Defendant was Unjustly Enriched from the Use of The Pixel.*

127. The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiffs' and Class Members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data for advertising in the absence of express written consent.

128. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy. In exchange for disclosing its patients' PII, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on Facebook.

129. Upon information and belief, Defendant was advertising its services on Facebook, and the Pixel was used to "help [Defendant] understand the success of [its] advertisement efforts on Facebook."

130. Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

---

[45] *Id.*

[46] *Id.*

131.   Upon information and belief, Defendant re-targeted patients and potential patients to get more patients to use its services.

132.   By utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

### I.   Plaintiffs' Private Information Has Value

133.   Facebook is one of the largest advertising companies in the country, with over 2.9 billion active users.[47]

134.   Realizing the value of having direct access to millions of consumers, in 2007, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming it to be a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads."[48]

135.   Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Facebook's advertising services. Meta generates almost all of its revenue from selling advertisement placements, as depicted in *Figure 7*:

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|--------------|-----------|--------------|
| 2023 Q1 | $28.65 billion | $28.101 billion | 98.1% |
| 2022 | $116.61 billion | $113.64 billion | 97.5% |
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |

136.   One of its most powerful advertising tools is Meta Pixel, formerly known as Facebook Pixel, which launched in 2015.

---

[47] S. Dixon, *Facebook Users by Country 2023*, STATISTA (February 24, 2023), www.statista.com/statistics/268136/top-15-countries-based-on-number-of-facebook-users/.

[48] *Facebook Unveils Facebook Ads*, META (November 6, 2007), https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/.

137.   Ad Targeting has been extremely successful due, in large part, to Facebook's ability to target people at a granular level. "Among many possible target audiences, Facebook offers advertisers, [for example,] 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[49]

138.   Acknowledging that micro-level targeting is highly problematic, in November of 2021, Facebook announced that it was removing options that "relate to topics people may perceive as sensitive," such as "Health causes (e.g., 'Lung cancer awareness', 'World Diabetes Day', 'Chemotherapy'), Sexual orientation (e.g., 'same-sex marriage' and 'LGBT culture'), "Religious practices and groups" (e.g., 'Catholic Church' and 'Jewish holidays')" as well as "Political beliefs, social issues, causes, organizations, and figures."

139.   For Facebook, the Pixel acts as a conduit of information. If the User has a Facebook account, the Private Information collected is linked to the individual Users' Facebook account.

140.   Facebook can also link the data to a users' Facebook account through the "Facebook Cookie," which is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users.[50]

---

[49] Natasha Singer, *What You Don't Know about How Facebook Uses Your Data*, N.Y. TIMES (April 11, 2018), https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.

[50] Maciej Zawadziński & Michal Wlosik, *What Facebook's First-Party Cookie Means for AdTech,* CLEAR CODE (June 8, 2022), https://clearcode.cc/blog/facebook-first-party-cookie-adtech/.

141.   A recent investigation revealed that the Meta Pixel was installed inside password-protected patient portals of at least seven health systems.[51] When a User navigates through their patient portal, the Meta Pixel sends Facebook sensitive data including but not limited to, the User's medication information, prescriptions, descriptions of their issues, notes, test results and details about upcoming doctor's appointments.

142.   David Holtzman, a health privacy consultant, was "deeply troubled" by the results of The Markup's investigation and indicated "it is quite likely a HIPAA violation" by the hospitals, such as Defendant.[52]

143.   Laura Lazaro Cabrera, a legal officer at Privacy International, indicated that Facebook's access to use even only some of these data points—such as just the URL—is problematic. She explained, "Think about what you can learn from a URL that says something about scheduling an abortion' . . . 'Facebook is in the business of developing algorithms. They know what sorts of information can act as a proxy for personal data."[53]

144.   The collection and use of this data raises concerns about user privacy and the potential misuse of personal information. For example, when Users browse Defendant's Web Properties, every bit of their activity is tracked and monitored. By analyzing this data using algorithms and machine learning techniques, these entities

---

[51] *See* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), *available at* https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Nov. 7, 2023).

[52] *Id.*

[53] Grace Oldham & Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, THE MARKUP (Sept. 25, 2022), https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients.

tracking this information can learn a chilling level of detail about Users' behavioral patterns, preferences and interests.

145.    While this data can be used to provide personalized and targeted content and advertising, it can also be used for more nefarious purposes, such as tracking and surveillance. For example, if an advertiser or social media platform has access to a User's browsing history, search queries and social media activity, they could potentially build a detailed profile of that User's behavior patterns, including where they go, what they do and who they interact with.

146.    This level of surveillance and monitoring raises important ethical and legal questions about privacy, consent and the use of personal data. It is important for Users to be aware of how their data is being collected and used and to have control over how their information is shared and used by advertisers and other entities.

147.    Moreover, the misuse of this data could lead to the spread of false or misleading information, which could have serious consequences, particularly in the case of health-related information. As an example, the Cambridge Analytica scandal revealed that personal data was misused to target individuals with political propaganda and misinformation.[54]

148.    The Cambridge Analytica scandal involved the misuse of personal data collected from Facebook users, which was then used to target individuals with political advertising and propaganda. The scandal highlighted the potential dangers of using personal data for targeted advertising and the need for greater transparency and accountability in the collection and use of personal information.[55] One of the

---

[54] Sam Meredith, *Here's Everything You Need to Know about the Cambridge Analytica Scandal*, CNBC (March 23, 2018), https://www.cnbc.com/2018/03/21/facebook-cambridge-analytica-scandal-everything-you-need-to-know.html.

[55] *Id.*

ways that Cambridge Analytica was able to collect personal data was third-party apps that collected data from users and their friends. This data was then used to build detailed profiles of individuals, which were used to target them with personalized political ads and propaganda.

149.   The use of algorithms and machine learning techniques to analyze this data allowed Cambridge Analytica to identify patterns in users' behavior and preferences, which were then used to target them with specific messages and ads.

150.   This highlights the potential dangers of using personal data to build detailed profiles of individuals, particularly when that data is collected without their knowledge or consent. It also raises important questions about the ethics of using personal data for political purposes and the need for greater regulation and oversight of data collection and use.

151.   As pointed out by the OCR, impermissible disclosures of data in the healthcare context "may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI…. This tracking information could also be misused to promote misinformation, identity theft, stalking, and harassment."[56]

152.   Finally, as Judge Orrick pointed out in a recent decision allowing claims under California and common law against Regents of the University of California for collecting personal medical data via the Meta Pixel to go forward, "[p]ersonal medical information is understood to be among the most sensitive information that could be collected about a person" and unauthorized transmission or interception of such data by third parties may constitute a "highly offensive" intrusion of privacy. *Doe v. Regents of Univ. of Cal.*, 23-cv-00598-WHO (N.D. Cal. May 6, 2023).

---

[56] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, available at* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Nov. 7, 2023) (emphasis added).

**J.    Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their Private Information, Especially with Respect to Sensitive Medical Information.**

153.   Plaintiffs and Class Members have a reasonable expectation of privacy in their Private Information, including personal information and sensitive medical information.

154.   Patient PHI specifically is protected by federal law under HIPAA.

155.   HIPAA sets national standards for safeguarding protected health information. For example, HIPAA limits the permissible use of health information and prohibits the disclosure of this information without explicit authorization. *See* 45 C.F.R. § 164.502. HIPAA also requires that covered entities implement appropriate safeguards to protect this information. *See* 45 C.F.R. § 164.530(c)(1).

156.   Because federal legal framework applies to health care providers, including Defendant, Plaintiffs and the members of the Class had a reasonable expectation of privacy over their PHI.

157.   Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

158.   For example, a recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[57] Moreover, according to a study by Pew Research Center, a majority of Americans,

---

[57] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

CLASS ACTION COMPLAINT

approximately 79%, are concerned about how data is collected about them by companies.[58]

159. Medical data is even more valuable because unlike other personal information, such as credit card numbers that can be quickly changed, medical data is static. This is why companies possessing medical information, like Defendant, are intended targets of cyber-criminals.[59]

160. Patients using Defendant's Web Properties must be able to trust that the information they input, including their physicians, their health conditions and courses of treatment will be protected. Indeed, numerous state and federal laws require this. And these laws are especially important when protecting individuals with particular medical conditions, such as HIV or AIDS that can and do subject them to regular discrimination. Furthermore, millions of Americans keep their health information private because it can become the cause of ridicule and discrimination.

161. Other privacy law experts have expressed concerns about the disclosure to third parties of a users' sensitive medical information. For example, Dena Mendelsohn—the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs—explained that having your personal health information disseminated in ways you are unaware of, could have serious repercussions, including affecting your ability to obtain life

---

[58] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (November 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[59] Caroline Humer & Jim Finkle, *Your medical record is worth more to hackers than your credit card*, REUTERS (September 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924.

insurance and how much you pay for that coverage, increase the rate you are charged on loans, and leave you vulnerable to workplace discrimination.[60]

162.  A 2021 report by Invisibly found that personal medical information is one of the most valuable pieces of information within the market for data. The report noted that "[i]t's worth acknowledging that because health care records often feature a more complete collection of the PII User's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves. While a single social security number might go for $0.53, a complete health care record sells for $250 on average.[61]

163.  Defendant surreptitiously collected and used Plaintiffs' and Class Members' Private Information, including highly sensitive medical information, through Meta Pixel in violation of Plaintiffs' and Class Members' privacy interests.

## REPRESENTATIVE PLAINTIFFS' EXPERIENCES

**Plaintiff K.S.**

164.  Plaintiff K.S. has been a patient at Cottage Health in Santa Barbara since at least 2017. Plaintiff started using the Cottage Health Website in 2017, utilizing the Web Properties many times in recent years.

165.  Defendant encouraged Plaintiff to utilize Cottage Health's Website and online portal to search for doctors, make appointments, review medical treatments and review charts from previous exams.

---

[60] *See* Class Action Complaint, *Jane Doe v. Regents of the Univ. of Cal. d/b/a UCSF Medical Center*, CLASS ACTION (Feb. 9, 2023), https://www.classaction.org/media/doe-v-regents-of-the-university-of-california.pdf.

[61] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, NO. 220 (Apr. 2, 2013) https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last visited Nov. 8, 2023).

166.   While using Defendant's Web Properties, Plaintiff communicated sensitive—and what she expected to be confidential—personal and medical information to Defendant.

167.   Plaintiff used Cottage Health's Web Properties between 2017 and September 2023 to research healthcare providers (including orthopedic and prenatal specialists) and communicate with them, research particular medical concerns and treatments including but not limited to, treatment for carpal tunnel syndrome, prenatal classes during her pregnancy and pelvic floor therapy post-pregnancy; fill out forms and questionnaires; schedule and attend appointments including prenatal classes, birth of her child, and pelvic floor therapy; and perform other tasks related to her specific medical inquiries and treatment.

168.   Plaintiff also utilized Cottage Health's Patient Portal to refill prescriptions, look at her bills and payments and see her test results and notes from her appointments.

169.   While using Cottage Health's digital services, Plaintiff communicated and received information regarding her appointments, treatments, medications and clinical information, including her surgeries, lab work and scans. As a result of the Meta Pixel Defendant installed on its Web Properties, this information was intercepted, viewed analyzed and used by unauthorized third parties.

170.   Plaintiff accessed Cottage Health's Web Properties in connection with receiving healthcare services from Cottage Health or Cottage Health's affiliates at Cottage Health's direction and with Cottage Health's encouragement.

171.   Plaintiff has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

172.   Plaintiff has had a Facebook account since 2009 and started to receive unsolicited advertisements on her account relating to her medical conditions, including pregnancy, birth of her child, and post-maternity conditions, shortly after

visiting Cottage Health's Web Properties on several occasions in 2021 and early 2022.

173.  As a medical patient using Cottage Health's health services, Plaintiff reasonably expected that her online communications with Cottage Health were solely between herself and Cottage Health, and that such communications would not be transmitted or intercepted by a third party. Plaintiff also relied on Cottage Health's Privacy Policies in reasonably expecting Cottage Health would safeguard his Private Information. But for her status as Cottage Health's patient and its representations via its Privacy Policies, Plaintiff would not have disclosed her Private Information to Cottage Health.

**Plaintiff C.M.**

174.  Plaintiff C.M. has been a patient at Cottage Health in Santa Barbara since at least 2004. Plaintiff C.M. started using the Cottage Health Website over fifteen years ago, and the patient portal since it was made available to Defendant's patients, utilizing the Web Properties many times in recent years.

175.  Defendant encouraged Plaintiff C.M. to utilize Cottage Health's Web Properties to search for doctors and review medical treatments and test results.

176.  While using Defendant's Web Properties, Plaintiff C.M. communicated sensitive—and what she expected to be confidential—personal and medical information to Defendant.

177.  Plaintiff C.M. used Cottage Health's Web Properties to research healthcare providers (including neurologists), research particular medical concerns and treatments (including concussions and diabetes), look up and attend medical seminars and perform other tasks related to her specific medical inquiries and treatment.

178.  Plaintiff C.M. also utilized Cottage Health's Patient Portal to look at her bills and payments and to see her test results and notes from her appointments which included her medical history, current diagnoses and treatment.

CLASS ACTION COMPLAINT

179.   While using Cottage Health's Web Properties, Plaintiff C.M. received information regarding her appointments, treatments, medications and clinical information, including her lab work. As a result of the Meta Pixel Defendant installed on its Web Properties, this information was intercepted, viewed analyzed and used by unauthorized third parties.

180.   Plaintiff C.M. accessed Cottage Health's Web Properties in connection with receiving healthcare services from Cottage Health or Cottage Health's affiliates at Cottage Health's direction and with Cottage Health's encouragement.

181.   Plaintiff C.M. has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

182.   Plaintiff C.M. has had a Facebook account for over a decade and started to receive unsolicited advertisements relating to her medical conditions, including but not limited to, her neurologist and his seminars on concussions and diabetes-related ads, shortly after visiting Cottage Health's Web Properties.

183.   As a medical patient using Cottage Health's health services, Plaintiff C.M. reasonably expected that her online communications with Cottage Health were solely between herself and Cottage Health, and that such communications would not be transmitted or intercepted by a third party. Plaintiff C.M. also relied on Cottage Health's Privacy Policies in reasonably expecting Cottage Health would safeguard her and her husband's Private Information. But for her status as Cottage Health's patient and its representations via its Privacy Policies, Plaintiff C.M. would not have disclosed her and her husband's Private Information to Cottage Health.

**<u>TOLLING, CONCEALMENT & ESTOPPEL</u>**

184.   The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

CLASS ACTION COMPLAINT

185.   Defendant secretly incorporated the Meta Pixel into its Web Properties and patient portals, providing no indication to Users that their User Data, including their Private Information, would be disclosed to unauthorized third parties.

186.   Defendant had exclusive knowledge that the Meta Pixel was incorporated on its Web Properties, yet failed to disclose that fact to Users, or inform them that by interacting with its Web Properties, Plaintiffs' and Class Members' User Data, including Private Information, would be disclosed to third parties, including Facebook.

187.   Plaintiffs and Class Members could not, with due diligence, have discovered the full scope of Defendant's conduct because the incorporation of Meta Pixels is highly technical, and there were no disclosures or other indications that would inform a reasonable consumer that Defendant was disclosing and allowing Facebook to intercept Users' Private Information.

188.   The earliest Plaintiffs and Class Members could have known about Defendant's conduct was approximately in April or May of 2023. Nevertheless, at all material times herein, Defendant falsely represented to Plaintiffs that their health information is not and will not be disclosed to any third party.

189.   As alleged above, Defendant has a duty to disclose the nature and significance of its data disclosure practices but failed to do so. Defendant is, therefore, estopped from relying on any statute of limitations under the discovery rule.

## **CLASS ALLEGATIONS**

190.   **Class Definition:** Plaintiffs bring this action on behalf of themselves and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

191.   The Nationwide Class that Plaintiffs seek to represent is defined as:

**Nationwide Class:** All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel on Defendant's Web Properties.

192. The California Subclass that Plaintiffs seek to represent is defined as:

**California Subclass:** All individuals residing in the State of California whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel on Defendant's Web Properties.

193. The Nationwide Class, and the California Subclass are referred to collectively as the "**Classes**." Excluded from the Classes are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant's officer or director, any successor or assign and any Judge who adjudicates this case, including their staff and immediate family.

194. **The following people are excluded from the Class:** (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors and any entity in which Defendant or its parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors and assigns of any such excluded persons.

195. Plaintiffs reserve the right under Federal Rule of Civil Procedure 23 to amend or modify the Classes to include a broader scope, greater specificity, further division into subclasses, or limitations to particular issues. Plaintiffs reserve the right under Federal Rule of Civil Procedure 23(c)(4) to seek certification of particular issues.

CLASS ACTION COMPLAINT

196.   The requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are met in this case.

197.   The Fed. R. Civ. P. 23(a) elements of Numerosity, Commonality, Typicality, and Adequacy are all satisfied.

198.   **Numerosity**: The exact number of Class Members is not available to Plaintiffs, but it is clear that individual joinder is impracticable. Hundreds of thousands of people have used Cottage Health's Web Properties since at least 2015. Members of the Class can be identified through Defendant's records or by other means.

199.   **Commonality:** Commonality requires that the Class Members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke. Here, there is a common contention for all Class Members as to whether Defendant disclosed to third parties their Private Information without authorization or lawful authority.

200.   **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members in that Plaintiffs and the Class Members sustained damages arising out of Defendant's uniform wrongful conduct and data-sharing practices.

201.   **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' claims are made in a representative capacity on behalf of the Class Members. Plaintiffs have no interests antagonistic to the interests of the other Class Members. Plaintiffs have retained competent counsel to prosecute the case on behalf of Plaintiffs and the Class. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the Class members.

202.   The declaratory and injunctive relief sought in this case includes, but is not limited to:

a. Entering a declaratory judgment against Defendant—declaring that Defendant's interception of Plaintiffs' and Class Members' Private Information is in violation of the law;

b. Entering an injunction against Defendant:

    i. preventing Defendant from sharing Plaintiffs' and Class Members' Private Information among itself and other third parties;

    ii. requiring Defendant to alert and/or otherwise notify all users of its websites and portals of what information is being collected, used, and shared;

    iii. requiring Defendant to provide clear information regarding its practices concerning data collection from the users/patients of Defendant's Web Properties, as well as uses of such data;

    iv. requiring Defendant to establish protocols intended to remove all personal information which has been leaked to Facebook and/or other third parties, and request Facebook/third parties to remove such information and

    v. requiring Defendant to provide an opt out procedure for individuals who do not wish for their information to be tracked while interacting with Defendant's Web Properties.

203. **Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and Class Members, and those questions predominate over any questions that may affect individual Class Members. Common questions and/or issues for Class members include, but are not necessarily limited to the following:

a. Whether Defendant's acts and practices violated California's Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq.*;

b. Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;

45

CLASS ACTION COMPLAINT

c.  Whether Defendant's acts and practices violated the California Unfair
    Competition Law, Cal. Bus. & Prof. Code Section 17200, *et seq.*;

d.  Whether Defendant's acts and practices violated the California
    Consumers Legal Remedies Act, Cal. Civ. Code Section 1750 *et seq.*;

e.  Whether Defendant's unauthorized disclosure of Users' Private
    Information was negligent;

f.  Whether Defendant owed a duty to Plaintiffs' and Class Members not to
    disclose their Private Information to unauthorized third parties;

g.  Whether Defendant breached its duty to Plaintiffs and Class Members
    not to disclose their Private Information to unauthorized third parties;

h.  Whether Defendant represented to Plaintiffs and the Class that it would
    protect Plaintiff's and the Class Members' Private Information;

i.  Whether Defendant violated Plaintiffs' and Class Members' privacy
    rights;

j.  Whether Plaintiffs and Class Members are entitled to actual damages,
    enhanced damages, statutory damages, and other monetary remedies
    provided by equity and law;

k.  Whether injunctive and declaratory relief, restitution, disgorgement, and
    other equitable relief is warranted.

204.  **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by individual Class Members will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual Class Members to obtain effective relief from Defendant's misconduct. Even if Class Members could mount such individual litigation, it would still not be preferable to a class action, because individual litigation would increase

the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be enhanced, and uniformity of decisions ensured.

205.  Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendant misrepresented that it would disclose personal information only for limited purposes that did not include purposes of delivering advertisements or collecting data for commercial use or supplementing consumer profiles created by data aggregators and advertisers;

    b.  Whether Defendant's privacy policies misrepresented that it collected and shared User information with third-party service providers only for the limited purpose of providing access to its services;

    c.  Whether Defendant misrepresented that it had in place contractual and technical protections that limit third-party use of User information and that it would seek User consent prior to sharing Private Information with third parties for purposes other than the provision of its services;

    d.  Whether Defendant misrepresented that any information it receives is stored under the same guidelines as any health entity that is subject to the strict patient data sharing and protection practices set forth in the regulations propounded under HIPAA;

    e.  Whether Defendant misrepresented that it complied with HIPAA's requirements for protecting and handling Users' PHI;

CLASS ACTION COMPLAINT

f. Whether Defendant shared the Private Information that Users provided to Defendant with advertising platforms, including Facebook, without adequate notification or disclosure, and without Users' consent, in violation of health privacy laws and rules and its own privacy policy;

g. Whether Defendant integrated third-party tracking tools, consisting of automated web beacons ("Pixels") in its website that shared Private Information and User activities with third parties for unrestricted purposes, which included advertising, data analytics, and other commercial purposes;

h. Whether Defendant shared Private Information and activity information with Facebook using Facebook's tracking Pixels on its Web Properties without Users' consent;

i. Whether Facebook used the information that Defendant shared with it for unrestricted purposes, such as selling targeted advertisements, data analytics, and other commercial purposes.

## <u>COUNT I</u>

## <u>VIOLATION OF THE CONFIDENTIALITY OF MEDICAL INFORMATION ACT CAL. CIV. CODE §§ 56, *et seq.*</u>

### (*On behalf of Plaintiffs & the California Subclass*)

206. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

207. Defendant is subject to the CMIA pursuant to California Civil Code § 56.10 because it is a "provider of health care" as defined by California Civil Code § 56.06(b); it operates hospitals, provides health care, maintains medical information, offers software to consumers designed to maintain medical information for the purposes of communications with doctors, receipt of diagnosis, treatment, or management of medical conditions.

CLASS ACTION COMPLAINT

208.   Section 56.10 states, in pertinent part, that "[n]o provider of health care . . . shall disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization . . . ."

209.   Section 56.101 of the CMIA states, in pertinent part, that "[a]ny provider of health care . . . who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties . . ." Cal. Civ. Code §§ 56.10, 56.101.

210.   Plaintiffs' and the California Subclass Members' Private Information constitutes "medical information" under the CMIA because it consists of individually identifiable information in possession of and derived from a provider of healthcare regarding Plaintiffs' and California Subclass Members' medical history, test results, mental or physical condition and/or treatment.

211.   Defendant violated Cal. Civ. Code § 56.10 because it failed to maintain the confidentiality of Users' medical information, and instead "disclose[d] medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization" by soliciting, intercepting and receiving Plaintiffs' and California Subclass Members' Private Information, and sharing it with advertisers and for advertising purposes. Specifically, Defendant knowingly, willfully, or negligently disclosed Plaintiffs' and California Subclass Members' medical information to Facebook, allowing Facebook to now advertise and target Plaintiffs and California Subclass Members, misusing their extremely sensitive Private Information.

212.   Defendant violated Cal. Civ. Code § 56.101 because they knowingly, willfully, or negligently failed to create, maintain, preserve, store, abandon, destroy and dispose of medical information in a manner that preserved its confidentiality by soliciting, intercepting, and receiving Plaintiffs' and California Subclass Members' Private Information, and sharing it with advertisers and for advertising purposes for Facebook's and Defendant's financial gain.

213.  Defendant intentionally embedded Facebook Pixels, which facilitate the unauthorized sharing of Plaintiffs' and California Subclass Members' medical information.

214.  Defendant violated Cal Civ. Code § 56.36(b) because they negligently released confidential information and records concerning Plaintiffs and California Subclass Members in violation of their rights under the CMIA.

215.  As a direct and proximate result of Defendant's misconduct, Plaintiffs and California Subclass Members had their private communications containing information related to their sensitive and confidential Private Information intercepted, disclosed and used by third parties.

216.  As a result of Defendant's unlawful conduct, Plaintiffs and California Subclass Members suffered an injury, including violation to their rights of privacy, loss of the privacy of their Private Information, loss of control over their sensitive personal information, and suffered aggravation, inconvenience and emotional distress.

217.  Plaintiffs and California Subclass Members are entitled to: (a) nominal damages of $1,000 per violation; (b) actual damages, in an amount to be determined at trial; (c) reasonable attorneys' fees, and costs.

## COUNT II

## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ("CIPA"), CAL. PENAL CODE § 630, *et seq.*

### *(On behalf of Plaintiffs & the California Subclass)*

218.  Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

219.  Defendant is a person for purposes of Cal. Penal Code §631.

220.  CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that

the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following: (1) "intentionally taps, or makes any unauthorized connection…with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) ***aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section***" (emphasis added).

221.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

222.    Defendant's Web Properties are a "machine, instrument, contrivance, or ... other manner" used to engage in the prohibited conduct at issue here.

223.    At all relevant times, Defendant entered into contracts with Facebook, in order to track certain activities on its Web Properties. Defendant allowed Facebook to intercept and otherwise track Users' clicks, communications, searches, and other User activities. Defendant activated Facebook Pixel tracking tools, allowing

51

Facebook to intentionally tap, and make unauthorized connections with, the lines of internet communication between Plaintiffs and California Subclass Members on the one hand, and Defendant's Web Properties on the other hand, without consent of all parties to the communication.

224.   At all relevant times, by using the Facebook Pixel, Facebook willfully and without the consent of Plaintiffs and California Subclass Members, read or attempted to learn the contents or meaning of electronic communications of Plaintiffs and putative California Subclass Members on Defendant's Web Properties. This occurred while the electronic communications were in transit or passing over any wire, line or cable, or were being sent from or received at any place within California. Facebook intercepted Plaintiffs' and California Subclass Members' communications—including the very terms and phrases they typed into the search bar—without their authorization or consent.

225.   Defendant knowingly installed Pixel tracking technology on its Web Properties, which systematically transmitted all communications between Plaintiffs and Defendant's Web Properties to Meta. Indeed, Meta released an explicit statement to the Court on November 9, 2022, that it neither desired nor intended to possess health information data. In April 2018, Meta proactively added a clause to its user contract specifying that it requires each of its partners, including Defendant, to have "lawful" rights to collect, use, and share user data before providing any data to Meta.

226.   Defendant had the explicit option to disable the Pixel technology on its Web Properties, but chose not to exercise this option, thereby continuing to share data with Facebook despite the availability of preventive measures.

227.   These assertions highlight that Meta advised third-party entities, like Defendant, to refrain from sending any information they did not have the legal right to send and expressly emphasized not to transmit health information. Yet, Defendant, in direct contravention of these advisories and in a clear display of

intent, continued to employ Pixel tracking on its Web Properties, thereby sharing sensitive patient data without proper authorization or consent.

228. Additionally, by embedding Facebook Pixels on its Web Properties, Defendant aided, agreed with, employed, and conspired with Facebook to wiretap consumers communications on Defendant's Web Properties using the Facebook Pixel snipped codes and to accomplish the wrongful conduct at issue here.

229. Plaintiffs and California Subclass Members did not consent to the interception, reading, learning, recording, and collection of their electronic communications with Defendant. Accordingly, the interception was unlawful and tortious.

230. Defendant both intercepted and aided Facebook in the interception of "contents" of Plaintiffs' communications in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of information generated when patients requested or made appointments;

g. The precise text of patient communications about specific treatments;

h. The precise text of patient communications about scheduling appointments with medical providers;

i. The precise text of patient communications about billing and payment;

j. The precise text of specific buttons on Defendant's Webs Properties that

patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

k.    The precise dates and times when patients click to Log-In on Defendant's Web Properties;

l.    The precise dates and times when patients visit Defendant's Web Properties;

m.    Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

n.    Any other content that Defendant has aided third parties in scraping from webpages or communication forms at Web Properties.

231.  Defendant gave substantial assistance to Facebook in violating the privacy rights of Defendant's patients, despite the fact that Defendant's conduct constituted a breach of the duties of confidentiality that medical providers owe their patients. Defendant knew that the installation of the Meta Pixel on its Web Properties would result in the unauthorized disclosure of its patients' communications to Facebook, yet nevertheless did so anyway.

232.  The violation of section 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

233.  Unless enjoined, Defendant will continue to commit the illegal acts alleged here. Plaintiffs continue to be at risk because they frequently use Defendant's Web Properties to search for information about medical products, health conditions or services. Plaintiffs continue to desire to use Defendant's Web Properties for that purpose, including but not limited to investigating health

conditions (e.g., diabetes), diagnoses (e.g., COVID-19), procedures, test results, treatment status, the treating physician, medications, and/or allergies.

234.   Plaintiffs and California Subclass Members may or are likely to visit Defendant's Web Properties in the future but have no practical way of knowing whether their website communications will be collected, viewed, accessed, stored, and used by Facebook.

235.   Plaintiffs and California Subclass Members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

236.   In addition to statutory damages, Defendant's breach caused Plaintiffs and California Subclass Members, at minimum, the following damages: (1) Sensitive and confidential information that Plaintiffs and California Subclass Members intended to remain private is no longer private; and (2) Defendant took something of value from Plaintiffs and California Subclass Members and derived benefit therefrom without Plaintiffs' and California Subclass Members' knowledge or informed consent and without sharing the benefit of such value.

## COUNT III
## VIOLATION OF THE UNFAIR COMPETITION LAW ("UCL") CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *et seq.*
### *(On behalf of Plaintiffs & the California Subclass)*

237.   Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

### A. Unlawful Prong

238.   Defendant's conduct, as alleged herein, was unfair within the meaning of the UCL. The unfair prong of the UCL prohibits unfair business practices that either offend an established public policy or that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

239.   Defendant's conduct was also fraudulent within the meaning of the UCL. Defendant made deceptive misrepresentations and omitted known material facts in connection with the solicitation, interception, disclosure, and use of Plaintiffs' and California Subclass Members' Private Information. Defendant actively concealed and continued to assert misleading statements regarding its protection and limitation on the use of the Private Information. Meanwhile, Defendant was collecting and sharing Plaintiffs' and California Subclass Members' Private Information without their authorization or knowledge to profit off of the information and deliver targeted advertisements to Plaintiffs and California Subclass Members, among other unlawful purposes.

240.   Defendant's conduct was further unlawful within the meaning of the UCL because it violated regulations and laws as discussed herein, including but not limited to HIPAA, Section 5 of the Federal Trade Commission Act ("**FTCA**"), 15 U.S.C. § 45, and the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq*.

241.   Had Plaintiffs and California Subclass Members known Defendant would disclose and misuse their Private Information in contravention of Defendant's representations, they would never have used Defendant's Web Properties Portal and would not have shared their Private Information.

242.   Defendant's unlawful actions in violation of the UCL have caused and are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves, and that is not outweighed by countervailing benefits to consumers or competition.

243.   As a direct and proximate result of Defendant's misconduct, Plaintiffs and California Subclass Members had their private communications containing information related to their sensitive and confidential Private Information intercepted, disclosed, and used by third parties, including but not limited to Facebook.

244.   As a result of Defendant's unlawful conduct, Plaintiffs and California Subclass Members suffered an injury, including violation of their rights of privacy, loss of value and privacy of their Private Information, loss of control over their sensitive personal information, and suffered embarrassment and emotional distress as a result of this unauthorized sharing of information.

**B. Unfair Prong**

245.   Defendant engaged in unfair business practices by disclosing Plaintiffs' and California Subclass Members' Private Information to unrelated third parties, including Facebook, without prior consent despite its promises to keep such information confidential.

246.   Defendant's unfair business practices included widespread violations of Plaintiffs' and California Subclass Members' rights to privacy, including its failure to inform the public that using its Web Properties would result in disclosure of highly private information to third parties.

247.   Because Defendant is in the business of providing medical healthcare services, Plaintiffs and California Subclass Members relied on Defendant to advise them of any potential disclosure of their Private Information.

248.   Plaintiffs and California Subclass Members were entitled to assume, and did assume, that Defendant would take appropriate measures to keep their Private Information secure and confidential. At no point did Plaintiffs expect to become a commodity on which Defendant and Facebook would trade.

249.   Plaintiffs and California Subclass Members reasonably relied upon the representations Defendant made in its Privacy Policy, including those representations concerning the confidentiality of Private Information, such as patient health information.

250.   Defendant was in sole possession of and had a duty to disclose the material information that Plaintiffs' and California Subclass Members' private information was being shared with third parties.

57

251.  Had Defendant disclosed that it shared Private Information with third parties, Plaintiffs and the California Subclass Members would not have used Defendant's services at the level they did.

252.  The harm caused by Defendant's conduct outweighs any potential benefits attributable to such conduct, and there were reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described herein.

253.  Defendant's acts, omissions and conduct also violate the unfair prong of the UCL because those acts, omissions and conduct offended public policy (including the aforementioned federal and state privacy statutes and state consumer protection statutes, such as HIPAA), and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and California Subclass Members.

254.  As a direct result of Plaintiffs' and California Subclass Members' reliance on Defendant's representations that Defendant would keep their Private Information confidential and Defendant's express representation that they would not share Private Information with third parties without the Users' express consent, Plaintiffs and California Subclass Members shared highly sensitive information through their use of the Web Properties, causing them to suffer damages when Defendant disclosed said information to a third party.

255.  As a direct result of Defendant's violations of the UCL, Plaintiffs and California Subclass Members have suffered injury in fact and lost money or property, including but not limited to payments to Defendant and/or other valuable consideration. The unauthorized access to Plaintiffs' and California Subclass Members' private and personal data also diminished the value of that Private Information.

256.  As a direct result of its unfair practices, Defendant has been unjustly enriched and should be required to make restitution to Plaintiffs and California

Subclass Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5) and injunctive or other equitable relief.

## COUNT IV

## INVASION OF PRIVACY—INTRUSION UPON SECLUSION

### *(On behalf of Plaintiffs & the Classes)*

257.   Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

258.   Plaintiffs and Class Members had a reasonable and legitimate expectation of privacy in the Private Information that Defendant failed to adequately protect against disclosure from unauthorized parties.

259.   Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

260.   Defendant failed to protect and release to unknown and unauthorized third parties the Private Information of Plaintiffs and Class Members.

261.   By failing to keep Plaintiffs' and Class Members' Private Information confidential and safe from misuse, Defendant knowingly shared highly sensitive Private Information with Facebook, Defendant unlawfully invaded Plaintiffs' and Class Members' privacy by, among others: (i) intruding into Plaintiffs' and Class Members' private affairs in a manner that would be highly offensive to a reasonable person; (ii) failing to adequately secure their Private Information from disclosure to unauthorized persons; and (iii) enabling and facilitating the disclosure of Plaintiffs' and Class Members' Private Information without authorization or consent.

262.   Plaintiffs' and Class Members' expectation of privacy was and is especially heightened given Defendant's consistent representations that Users' information would remain confidential and would not be disclosed to anyone without User consent.

CLASS ACTION COMPLAINT

263.  Defendant's privacy policy specifically provides, "Most uses and disclosures of medical information for marketing purposes, and disclosures that constitute a sale of medical information, require your authorization."[62]

264.  Defendant knew, or acted with reckless disregard, of the fact that a reasonable person in Plaintiffs' and Class Members' position would consider its actions highly offensive.

265.  Defendant's unauthorized surreptitious recording, monitoring, and sharing of the Users' activities, research of diagnosis and treatment and searches for doctors and medical specialists violated expectations of privacy that have been established by social norms.

266.  As a proximate result of such unauthorized disclosures, Plaintiffs' and Class Members' reasonable expectations of privacy in their Private Information were unduly frustrated and thwarted and caused damages to Plaintiffs and Class Members.

267.  Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's conduct, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights.

268.  Plaintiffs seek injunctive relief on behalf of the Class, restitution, as well as any and all other relief that may be available at law or equity. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause irreparable injury to Plaintiffs and Class Members. Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and the Class.

---

[62] Cottage Health Notice of Privacy Practices, *see supra* note 6.

## <u>COUNT V</u>

## <u>BREACH OF IMPLIED CONTRACT</u>

### *(On behalf of Plaintiffs & the Classes)*

269.  Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

270.  When Plaintiffs and Class Members provided their Private Information to Defendant in exchange for services, they entered into implied contracts by which Defendant agreed to safeguard and not disclose such Private Information without consent.

271.  Plaintiffs and Class Members accepted Defendant's offers of services and provided their Private Information to Defendant via the Web Properties.

272.  Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them that included Defendant's promise not to disclose Private Information without consent.

273.  Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

274.  Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information to third parties, including Facebook.

275.  As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages, as alleged herein. Plaintiffs and Class Members would not have used Defendant's services, or would have paid substantially less for these services, had they known their Private Information would be disclosed.

276.  Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

CLASS ACTION COMPLAINT

1

## **COUNT VI**

2 ## **VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT,**

3 ## **CAL. CIV. CODE § 1750, *et seq.* ("CLRA")**

4 ### (***On behalf of Plaintiffs & the California Subclass***)

5     277.  Plaintiffs repeat the allegations contained in the paragraphs above as if

6 fully set forth herein.

7     278.  Defendant engaged in "unfair methods of competition and unfair or

8 deceptive acts . . . in a transaction . . . that result[ed] . . . in the sale . . . of goods" to

9 Plaintiffs and California Subclass Members in violation of Cal. Civ. Code § 1750

10 and Cal. Civ. Code § 1770(a)(5), (7), (9), (14), (16).

11     279.  For instance, Defendant made representations that it would protect

12 Plaintiffs' and the California Subclass Members' privacy interest, including

13 promising that it will keep Private Information private and secure, that Defendant

14 does not sell Users' Private Information, and that it will only disclose Private

15 Information under certain circumstances, none of which was true.

16     280.  Defendant made these representations with no intention of living up to

17 these representations. Contrary to these representations, Defendant disclosed and

18 allowed third parties to intercept its customers' Private Information.

19     281.  Further, Defendant failed to disclose it secretly shared, used, and

20 allowed third parties to intercept Plaintiffs' and California Subclass Members'

21 Private Information.

22     282.  Defendant was under a duty to disclose this information given

23 Defendant's relationship with its customers and Defendant's exclusive knowledge

24 of its misconduct (e.g., the tracking technology incorporated on Defendant's

25 Website, the fact that Private Information is disclosed to unauthorized third parties,

26 that Defendant allowed third parties to intercept Private Information through this

27 technology, and how Defendant and third parties used this data).

28

CLASS ACTION COMPLAINT

283. Plaintiffs and California Subclass Members would not have purchased, or would have paid significantly less for, Defendant's medical services had Defendant not made these false representations. Defendant profited directly from these sales, including through payment for these services, and from the Private Information disclosed and intercepted.

284. Plaintiffs, individually and on behalf of the California Subclass Members, seek an injunction requiring Defendant to obtain consent prior to disclosing and otherwise using Plaintiffs' and California Subclass Members' Private Information and to delete the Private Information already collected, and any other relief which the court deems proper.

**COUNT VII**

**NEGLIGENCE**

***(On behalf of Plaintiffs & the Classes)***

285. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

286. Defendant owed a duty to Plaintiffs and the Class Members to exercise due care in collecting, storing, safeguarding, and preventing any disclosure of their Private Information. This duty included but was not limited to: (a) preventing Plaintiffs' and Class Members' Private Information from being to be disclosed to unauthorized third parties; and (b) destroying Plaintiffs' and Class Members' Private Information within an appropriate amount of time after it was no longer required by Defendant.

287. Defendant's duties to use reasonable care arose from several sources, including those described below. Defendant had a common law duty to prevent foreseeable harm to others, including Plaintiffs and Class Members, who were the foreseeable and probable victims of any data misuse, such as disclosure of Private Information to unauthorized parties.

288.   Defendant had a special relationship with Plaintiffs and Class Members, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members resulting from unauthorized disclosure of their Private Information to third parties such as Facebook. Plaintiffs and Class Members were compelled to entrust Defendant with their Private Information. At relevant times, Plaintiffs and Class Members understood that Defendant would take adequate data storage practices to safely store their Private Information. Only Defendant could protect Plaintiffs' and Class Members' Private Information collected and stored on Defendant's Web Properties.

289.   Defendant's duty to use reasonable measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of [PHI]." 45 C.F.R. § 164.530(c)(1).

290.   Defendant's conduct, as described above, constituted an unlawful breach of its duty to exercise due care in collecting, storing, and safeguarding Plaintiffs' and the Class Members' Private Information by failing to protect this information.

291.   Defendant breached its duty in this relationship to collect and safely store Plaintiffs' and Class Members' Private Information.

292.   Plaintiffs' and the Class Members' Private Information would have remained private and secure had it not been for Defendant's wrongful and negligent breach of its duties. Defendant's negligence was, at least, a substantial factor in causing Plaintiffs' and Class Members' Private Information to be improperly accessed, disclosed, and otherwise compromised, and in causing Plaintiffs and the Class Members other injuries because of the unauthorized disclosures.

293.   The damages suffered by Plaintiffs and the Class Members were the direct and reasonably foreseeable result of Defendant's negligent breach of its duties to maintain Users' Private Information. Defendant knew or should have known that its unauthorized disclosure of highly sensitive Private Information was a breach of its duty to collect and safely store such information.

294.   Defendant's negligence directly caused significant harm to Plaintiffs and the Class. Specifically, Plaintiffs and Class Members are now subject to their sensitive information being accessed by unauthorized parties, which may lead to significant harm.

295.   Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

296.   Defendant had a fiduciary duty to protect the confidentiality of its communications with Plaintiffs and Class Members by virtue of the explicit privacy representations Defendant made on its Websites to Plaintiffs and members of the Class.

297.   Defendant had information relating to Plaintiffs and Class Members that it knew or should have known to be confidential.

298.   Plaintiffs' and Class Members' communications with Defendant about sensitive Private Information and their status as patients of Defendant were not matters of general knowledge.

299.   Defendant breached its fiduciary duty of confidentiality by designing its data protection systems in a way that allows for a data breach of a massive caliber.

300.   At no time did Plaintiffs or Class Members give informed consent to Defendant's conduct.

301.   As a direct and proximate cause of Defendant's actions, Plaintiffs and Class Members suffered damage in that the information they intended to remain private is no longer so and their Private Information was disclosed to, tracked, and

intercepted by third-party Internet tracking companies, including Facebook, without their knowledge or consent.

## COUNT VIII

## BREACH OF CONFIDENCE

### (*On Behalf of Plaintiffs & the Classes*)

302.   Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

303.   Medical providers have a duty to their patients to keep non-public medical information completely confidential.

304.   Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

305.   Plaintiffs' and Class Members' reasonable expectations of privacy in the communications exchanged with Defendant were further buttressed by Defendant's express promises in its Privacy Policies.

306.   Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant deployed the Pixel (and other tracking technologies) to disclose and transmit Plaintiffs' and Class Members' Private Information and the contents of their communications exchanged with Defendant to third parties.

307.   The third-party recipients included, but were not limited to, Facebook and other online marketers.

308.   Defendant's disclosures of Plaintiffs' and Class Members' Private Information were made without their knowledge, consent or authorization, and were unprivileged.

309.   The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

CLASS ACTION COMPLAINT

310.   As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

    a.   Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

    b.   Defendant eroded the essential confidential nature of the provider-patient relationship;

    c.   Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensating Plaintiffs and Class Members for the data;

    d.   Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

    e.   Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

    f.   Defendant's actions violated the property rights Plaintiffs and Class Members have in their Private Information.

311.   Plaintiffs and Class Members are, therefore, entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiffs are also entitled to punitive damages.

## COUNT IX

## BREACH OF FIDUCIARY DUTY

### (*On Behalf of Plaintiffs & the Classes*)

312.   Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

313.   In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became guardian of Plaintiffs' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

314.   Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant' relationship with its patients and former patients, in particular, to keep secure their Private Information.

315.   Defendant breached its fiduciary duties to Plaintiffs and Class Members by disclosing their Private Information to unauthorized third parties, and separately, by failing to notify Plaintiffs and Class Members of this fact.

316.   As a direct and proximate result of Defendant' breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## COUNT X

## UNJUST ENRICHMENT

### *(On behalf of Plaintiffs & the Classes)*

317.   Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

318.   Plaintiffs and Class Members personally and directly conferred a benefit on Defendant by paying Defendant for health care services, which included Defendant's obligation to protect Plaintiffs' and Class Members' Private Information. Defendant was aware of Plaintiffs' privacy expectations, and in fact, promised to maintain Plaintiffs' Private Information confidentially and not to

disclose it to third parties. Defendant received payments for medical services from Plaintiffs and Class Members.

319. Plaintiffs and Class Members also conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement, market research, sale, or trade for valuable benefits from Facebook and other third parties. Defendant had knowledge that Plaintiffs and Class Members had conferred this benefit on Defendant by interacting with its Web Properties, and Defendant intentionally installed the Meta Pixel tool on its Web Properties to capture and monetize this benefit conferred by Plaintiffs and Class Members.

320. Plaintiffs and Class Members would not have used Defendant's Web Properties had they known that Defendant would collect, use, and disclose this information to Facebook, Google, and other third parties. The services that Plaintiffs and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

321. The medical services that Defendant offers are available from many other healthcare systems that protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs' and Class Members' Private Health Information without consent, neither Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

322. By virtue of the unlawful, unfair and deceptive conduct alleged herein, Defendant knowingly realized hundreds of millions of dollars in revenue from the

69

use of the Private Information of Plaintiffs and Class Members for profit by way of targeted advertising related to Users' respective medical conditions and treatments sought.

323.  This Private Information, the value of the Private Information, and/or the attendant revenue were monetary benefits conferred upon Defendant by Plaintiffs and Class Members.

324.  As a result of Defendant's conduct, Plaintiffs and Class Members suffered actual damages in the loss of value of their Private Information and lost profits from the use of their Private Information.

325.  It would be inequitable and unjust to permit Defendant to retain the enormous economic benefits (financial and otherwise) it has obtained from and/or at the expense of Plaintiffs and Class Members.

326.  Defendant will be unjustly enriched if it is permitted to retain the economic benefits conferred upon them by Plaintiffs and Class Members through Defendant's obtaining the Private Information and the value thereof, and profiting from the unlawful, unauthorized and impermissible use of the Private Information of Plaintiffs and Class Members.

327.  Plaintiffs and Class Members are, therefore, entitled to recover the amounts realized by Defendant at the expense of Plaintiffs and Class Members.

328.  Plaintiffs and the Class Members have no adequate remedy at law and are therefore entitled to restitution, disgorgement, and/or the imposition of a constructive trust to recover the amount of Defendant's ill-gotten gains and/or other sums as may be just and equitable.

CLASS ACTION COMPLAINT

## COUNT XI

## VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")

## 18 U.S.C. § 2511(1), *et seq.*

## Unauthorized Interception, Use, and Disclosure

### (*On Behalf of Plaintiffs and the Classes*)

329.  Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

330.  The ECPA protects both sending and receipt of communications.

331.  18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

332.  The transmissions of Plaintiffs' PII and PHI to Defendant's Web Properties qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

333.  **Electronic Communications**. The transmission of PII and PHI between Plaintiffs and Class Members and Defendant's Web Properties with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

334.  **Content**. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

335.  Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding PII and PHI,

diagnosis of certain conditions, treatment/medication for such conditions, and scheduling of appointments, including annual mammograms, surgeries, emergency room visits, lab work, and scans. Furthermore, Defendant intercepted the "contents" of Plaintiffs' communications in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally, identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of information generated when patients requested or made appointments,

g. The precise text of patient communications about specific treatments;

h. The precise text of patient communications about scheduling appointments with medical providers;

i. The precise text of patient communications about billing and payment;

j. The precise text of specific buttons on Defendant's Web Properties that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

k. The precise dates and times when patients click to Log-In on Defendant's Web Properties;

l. The precise dates and times when patients visit Defendant's Web Properties;

m. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information.

336.  **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

337.  **Electronical, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiffs' and Class Members' browsers;

    b.  Plaintiffs' and Class Members' computing devices

    c.  Defendant's web servers; and

    d.  The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

338.  By utilizing and embedding the Pixel on its Web Properties, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

339.  Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Pixel, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as Facebook.

340.  Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding PII and PHI, treatment, medication, and scheduling.

341.  By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through

the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

342.   By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

343.   **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

344.   The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

345.   Defendant is not a party for purposes to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

346.   Defendant's acquisition of patient communications that were used and disclosed to Facebook was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

    a.  Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

    b.  Invasion of privacy;

    c.  Breach of confidence;

    d.  Breach of fiduciary duty;

CLASS ACTION COMPLAINT

e.  California Invasion of Privacy Act, §§ 630, *et seq*.;

f.  California Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56, *et seq*.;

347.  Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:  Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and disclosed individually identifiable health information to Facebook without patient authorization.

348.  The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

349.  Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

350.  Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Private Information on its Web Properties, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Private Information with Facebook and third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know was receiving their information, and that Plaintiffs and Class Members did not consent to receive this information.

351.  As such, Defendant cannot viably claim any exception to ECPA liability.

352.  Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a.  Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their PII and PHI (including information about their

medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and the Class Members' PII and PHI without providing any value or benefit to Plaintiffs or the Class members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and the Class Members' PII and PHI, such as understanding how people use its Web Properties and determining what ads people see on its Web Properties, without providing any value or benefit to Plaintiffs or the Class Members;

d. Defendant has failed to provide Plaintiffs and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of its patient information; and

e. The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, medical treatment, and appointments that Plaintiffs and Class Members intended to remain private no longer private.

353. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiffs' and Class Members' Private Information for financial gain.

354. Defendant was not acting under color of law to intercept Plaintiffs' and the Class Members' wire or electronic communication.

CLASS ACTION COMPLAINT

355.  Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixel.

356.  Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

357.  In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendant's Web Properties, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

358.  As a result of Defendant's violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Proposed Class defined herein, respectfully request:

A.   That this Action be maintained as a Class Action, that Plaintiffs be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and that notice of this Action be given to Class Members;

B.   That the Court enter an order:

a.  Preventing Defendant from sharing Plaintiffs' and Class Members' Private Information among other third parties;

b.  Requiring Defendant to alert and/or otherwise notify all users of its Websites and Portals of what information is being collected, used, and shared;

c.  Requiring Defendant to provide clear information regarding its practices concerning data collection from the users/patients of Defendant's Web Properties, as well as uses of such data;

d.  Requiring Defendant to establish protocols intended to remove all personal information which has been leaked to Facebook and/or other third parties, and request Facebook/third parties to remove such information;

e.  Requiring Defendant to provide an opt-out procedure for individuals who do not wish for their information to be tracked while interacting with Defendant's Web Properties;

f.  Mandating the proper notice be sent to all affected individuals and posted publicly;

g.  Requiring Defendant to delete, destroy, and purge the Private Information of Users unless Defendant can provide reasonable justification for the retention and use of such information when weighed against the privacy interests of Users;

h.  Requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted.

C.  That the Court award Plaintiffs and the Class Members damages (both actual damages for economic and non-economic harm and statutory damages) in an amount to be determined at trial;

D.  That the Court issue appropriate equitable and any other relief (including monetary damages, restitution, and/or disgorgement) against Defendant to which Plaintiffs and the Class are entitled, including but

CLASS ACTION COMPLAINT

1    not limited to restitution and an Order requiring Defendant to cooperate

2    and financially support civil and/or criminal asset recovery efforts;

3    E.    Plaintiffs and the Class be awarded with pre- and post-judgment

4    interest (including pursuant to statutory rates of interest set under State

5    law);

6    F.    Plaintiffs and the Class be awarded reasonable attorneys' fees and costs

7    of suit incurred by their attorneys;

8    G.    Plaintiffs and the Class be awarded with treble and/or punitive damages

9    insofar as they are allowed by applicable laws; and

10    H.    Any and all other such relief as the Court may deem just and proper

11    under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial on all triable issues.

DATED: November 10, 2023            */s/ Daniel Srourian*
                                    Daniel Srourian, California Bar No.
                                    285678
                                    **SROURIAN LAW FIRM, P.C.**
                                    3435 Wilshire Blvd. Suite 1710
                                    Los Angeles, CA 90010
                                    daniel@slfla.com

                                    John R. Parker, Jr., California Bar No.
                                    257761
                                    **ALMEIDA LAW GROUP LLC**
                                    3550 Watt Avenue, Suite 140
                                    Sacramento, California 95821
                                    jrparker@almeidalawgroup.com

                                    David S. Almeida (*pro hac vice
                                    forthcoming*)
                                    Britany Kabakov (*pro hac vice
                                    forthcoming*)
                                    Matthew J. Langley, California Bar No.
                                    342846

79

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 312-576-3024
david@almeidalawgroup.com
matt@almeidalawgroup.com

CLASS ACTION COMPLAINT